**In re Dorsey EVANS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 3939).**

**No. 05–BG–538.**

District of Columbia Court of Appeals.

April 27, 2006.

Before REID and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM:

 In this uncontested case, the Board on Professional Responsibility ("Board") has found that respondent Dorsey Evans violated Rules 1.1(a) (competent representation), 1.1(b) (skill and care), 1.7(b)(4) (conflict of interest), and 8.4(d) (conduct that seriously interferes with the administration of justice). This court will accept the Board's findings as long as they are supported by substantial evidence in the record. D.C. Bar R. XI, § 9(g)(1). We find substantial support in the record for the Board's findings, and accordingly, we accept them.

We append the Board's thorough and instructive report to this opinion.[1] As the report explains, the "central factor" in respondent's misconduct was a conflict of interest arising from his dual roles as both the owner of a title company that handles real estate loan closings and a lawyer whose practice includes probate and real estate matters. The conflict that led respondent into his ethical difficulties developed when his title company was contacted to close a real estate loan. It was discovered that the property to be encumbered was not owned by the prospective borrower, but instead belonged to the unprobated estate of the borrower's deceased mother-in-law. In his capacity as a lawyer, respondent thereupon undertook to represent the borrower and initiate a probate proceeding to secure her title to the property she wished to encumber. The potential conflict of interest was created by respondent's personal financial interest, through his ownership of the title business, in facilitating the closing of the loan. Respondent did not obtain his client's informed waiver of this potential conflict, which, the Board found, led him into a number of errors and more serious failings.

 The Board recommends a six month suspension, during which time respondent would be required to complete six hours of continuing education classes in probate law and legal ethics, that the final ninety days of his suspension be stayed on the condition that respondent agree to be placed on probation for a period of one year, that during the probationary period, respondent would be subject to oversight by a practice monitor, and that failure to cooperate with the practice monitor would violate his probation resulting in the imposition of the stayed portion of his suspension. We accept its recommended sanction for the reasons set forth by the Board in its report and because it is not inconsistent with the range of discipline imposed in similar cases involving conflict of interest. *In re Zelloe*, 686 A.2d 1034 (D.C. 1996) (ninety-day suspension for failure to disclose personal interest and dishonesty in connection with a loan transaction); *In re Shay*, 756 A.2d 465 (D.C.2000) (ninety-day suspension for multiple violations including dishonesty and conflict of interest); *In re Hager*, 812 A.2d 904 (D.C.2002) (one-year suspension for conflict of interest and dishonesty in connection with failure to disclose settlement-fee arrangement to clients). Further, Bar Counsel has informed the court that she takes no exception to the Board's report and recommendation, and respondent has not filed any exceptions to the Board's report and recommendation. Thus, we give heightened deference to the Board's recommendation. *See* D.C. Bar R. XI, § 9(g)(2); *In re Hitselberger*, 761 A.2d 27 (D.C.2000); *In re Delaney*, 697 A.2d 1212, 1214 (D.C.1997). Accordingly, it is

---

[1]. Judge Reid concurs in the resulting discipline, without incorporating the Report and

Recommendation of the Board on Professional Responsibility.

ORDERED that Dorsey Evans is suspended from the practice of law in the District of Columbia for a period of six months with reinstatement conditioned upon his completion of six hours of continuing legal education courses in the area of probate law and legal ethics. We direct respondent's attention to the requirements of D.C. Bar R. XI, § 14(g), and their effect on his eligibility for reinstatement. *See* D.C. Bar R. XI, § 16(c). It is

FURTHER ORDERED that the final ninety days of respondent's suspension be stayed on the condition that he agree to be placed on probation for a period of one year, during which time respondent shall be subject to oversight by a practice monitor. Failure to cooperate with the practice monitor shall violate his probation resulting in the imposition of the stayed portion of his suspension.

*So ordered.*

## APPENDIX

## *REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

This matter comes to the Board on Professional Responsibility (the "Board") from Hearing Committee Eight ("Committee"). It arises out of Respondent's representation of Carolyn Robinson in connection with a real estate loan. The story begins when Ms. Robinson decided to take out a loan with her house as security. Her mortgage broker referred her to a title company owned and operated by Respondent. Sometime thereafter, it became evident that Ms. Robinson did not have title to the property, which was deeded to her deceased mother-in-law, Zaidee Robinson. Respondent, in his capacity as an attorney, assisted Ms. Robinson in opening an estate for Zaidee, for which she was appointed as a co-personal representative with her son.

After a number of problems with the estate were discovered, the Probate Court removed Ms. Robinson as personal representative and referred the Respondent to Bar Counsel.

Bar Counsel charged Respondent with violating six D.C. Rules of Professional Conduct: Rule 1.1(a) by failing to provide competent representation; Rule 1.1(b) by failing to serve his client with the skill and care generally required; Rule 1.7(b)(4) by representing a client in a manner where his judgment might be adversely affected by his own financial interests; Rule 3.3(a)(2) by counseling or assisting a client to engage in criminal or fraudulent conduct; Rule 8.4(c) by engaging in dishonest conduct, and; Rule 8.4(d) by engaging in conduct that seriously interfered with the administration of justice. The Committee found that Respondent's conduct violated Rules 1.1(a), 1.1(b), 1.7(b)(4) and 8.4(d) and recommended a sixty-day suspension with readmission conditioned on successful completion of continuing education courses on ethics and probate law.

Respondent excepted to the Committee's findings of fact and conclusions of law, asking that the Board overturn them "in their entirety." Bar Counsel took no exception to the Committee's report and recommendation and filed a brief in support thereof. Upon review, we sustain the Committee's finding that Respondent violated Rules 1.1(a), 1.1(b), 1.7(b)(4) and 8.4(d). For the reasons explained below, we do not agree with the Committee that a sixty-day suspension with reinstatement conditioned on completion of continuing education classes is a sufficient sanction. We find that Respondent's misconduct demonstrates a need for assistance in assuring that his future conduct meets the ethical requirements of our profession. Accordingly, we recommend that the Respondent be suspended for six months.

We further recommend that ninety days of this suspension be stayed in favor of a one-year probationary period during which time Respondent will be required to work with a practice monitor. We also recommend that Respondent be required to take six hours of continuing legal education courses.

## I. *Procedural History*

Bar Counsel served the Respondent with the Specification of Charges on January 8, 2004. Respondent filed an answer on January 28, 2004. Bar Counsel filed "Bar Counsel's List of Exhibits" ("BX") marked as A through G, and 1 through 27 and Respondent filed "Respondent's List of Exhibits" ("RX"), marked as 1 through 3. The parties also filed a joint stipulation of certain facts ("JSF"). The Committee held a prehearing on February 10, 2004,[1] and heard evidence and argument on February 24 and March 2, 2004.[2] Bar Counsel called five witnesses: Rene Fox (expert on probate matters), Lane Potkin (expert on real estate matters), Donald Horton (former Deputy Register of Wills) and attorney Benny Kass (court-appointed successor personal representative of Zaidee Robinson's estate). Respondent, who appeared *pro se*, cross-examined Bar Counsel's witnesses and testified under oath on his own behalf, but did not present any other witnesses.

At the conclusion of the hearing, the Committee made a preliminary, non-binding determination that Respondent had violated at least one Rule of Professional Conduct, and each party made a submission on aggravation and mitigation. After the hearing, Bar Counsel submitted proposed findings of fact and conclusions of law, Respondent filed a response thereto and Bar Counsel filed a brief in reply.

The Committee issued its Report and Recommendation on April 30, 2004. As noted above, only Respondent excepted thereto. The Board heard oral argument on October 7, 2004.

## II. *Findings of Fact*

Although Respondent suggests that the Committee's findings be overturned in their entirety, he does not specifically challenge any of the Committee's factual findings. Hearing Committee findings of fact will be affirmed when supported by "substantial evidence on the record, viewed as a whole." Board R. 13.7; *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). We owe no deference, however, to the Hearing Committee's determination of "ultimate facts," such as whether the facts establish a violation of a Rule, and other conclusions of law. *Micheel,* 610 A.2d at 234; *In re Appler,* 669 A.2d 731, 739 (D.C.1995).

In this matter, we find the Committee's findings of fact, with one exception noted below, to be amply supported by the record. We have adopted many of them, but have eliminated certain other findings that are unnecessary to the analysis and outcome of this matter. Pursuant to Board Rule 13.7, we have made some additional findings to provide context and further support for our conclusions. Finally, we have revised and reorganized the findings for ease in evaluating the violations at issue.

### A. *Respondent's Practice*

1. Respondent is a member of the Bar of the District of Columbia Court of Appeals, having been admitted on June 1,

---

1. See Pre–Hearing Order, dated February 12, 2004.

2. The February 24, 2004 hearing will be referred to as Transcript ("Tr.") I; the March 2, 2004 hearing will be referred to as Tr. II.

1960. BX G 15 at 216. Respondent is also admitted to practice law in Maryland and Kansas. Tr. I at 93 (Respondent).

2. Respondent's practice has included probate matters in the D.C. Superior Court since that court was formed in 1972. Tr. I at 99 (Respondent); BX G 15 at 265.

3. Respondent also has an active real estate settlement practice. In 1997, Respondent owned Delco Title, which he operated out of his law office in Silver Spring, Maryland. Tr. I at 91 (Respondent). Bankers Financial Group, a mortgage lending company, used Respondent and Delco Title repeatedly for mortgage settlements over a three- to four-year period through 1997, sending Delco Title approximately 20 loans per month for handling. BX G 16 at 345–46 and 359–61.

B. *The Heirs of Zaidee Robinson*

4. Mrs. Zaidee H. Robinson died in 1987. BX E 1. At the time of her death, Zaidee Robinson owned real property located at 716 Ingraham Street in northwest Washington, D.C. (hereinafter the "Ingraham Street property"). As of April 1997, Zaidee Robinson's estate had never been probated. JSF ¶¶ 2–3; BX E 1.

5. Zaidee Robinson was survived by two sons, Maurice and Clifton. *Id.*

6. Maurice Robinson died in 1989. He was survived by his wife, Carolyn Robinson and two sons Qawi and Yusef. At the time of his death, Maurice and his family resided at the Ingraham Street property. *Id.* at ¶¶ 4, 6.

7. Following his mother's death, Clifton Robinson was incarcerated. *Id.* at ¶ 5.

C. *Respondent's Representation of Carolyn Robinson*

8. On April 17, 1997, Bankers Financial contacted Delco Title about handling a closing on a real estate loan for Carolyn Robinson. Answer, BX D at 21; Tr. I at 100–01 (Respondent); BX F 7 at 89; BX G 13 at 186. The loan was for $65,000 on the Ingraham Street property, where Carolyn Robinson lived at the time. BX F 7 at 94; JSF ¶ 8.

9. At some point after the initial referral, Respondent learned that the Ingraham Street property was deeded to Zaidee rather than Carolyn Robinson. Tr. I at 105–09 (Respondent); BX F 7. Carolyn Robinson subsequently retained Respondent to assist her in becoming personal representative of Zaidee Robinson's estate and in closing the loan on the Ingraham Street property. *Id.* As described by Respondent, his "office was asked to handle a title closing for Carolyn Robinson and a probate estate was opened to have the appropriate people appointed to sign for the loan." BX F 5 at 67.

10. The Committee concluded that the record is unclear regarding whether Respondent or a representative of Delco Title or anyone else in Respondent's office disclosed his interest in Delco Title to Carolyn Robinson. HC Report PFF 15. We disagree with this finding in view of Respondent's testimony that there was no situation in which it would have been appropriate for him to disclose his interest in Delco to Carolyn Robinson and that he had no knowledge whether she had such information prior to representing her in connection with the estate. Tr. II at 175–76. Accordingly, the Board finds that Bar Counsel proved by clear and convincing evidence that Respondent did not himself disclose his conflict to Carolyn Robinson and did not know whether she had knowingly waived the potential conflict prior to representing her in his capacity as an attorney.

11. On April 24, 1997, Respondent filed a Petition for Probate in the Probate Divi-

sion of the Superior Court of the District of Columbia, on behalf of Qawi S. Robinson, Carolyn Robinson, and Clifton Robinson, as petitioners. Qawi and Carolyn Robinson are listed as personal representatives. The petition bears signatures of all three petitioners and Respondent signed as counsel. BX E 5.

12. The petition listed Maurice Robinson, Carolyn's husband, as "deceased." *Id.* At the time of the filing, no probate estate had been opened for Maurice Robinson.

13. The petition listed Clifton Robinson as "incarcerated." BX E 5. Respondent was informed by Carolyn Robinson that Clifton would waive his interest in the estate. Tr. I at 110–12 (Respondent). Respondent made no effort to confirm this purported waiver with Clifton Robinson. BX G 13 at 187.

14. Forms entitled "Renunciation, Nomination of Personal Representative and Waiver of Bond" signed by Clifton and Yusef Robinson were filed with the Petition (the "renunciation forms"). BX E 5.

15. On April 29, 1997, a Probate Judge signed an Abbreviated Probate Order appointing Carolyn and Qawi Robinson as co-personal representatives of the estate of Zaidee Robinson. BX E 5.

16. On May 8, 1997, Qawi and Carolyn Robinson, as co-personal representatives of the estate, deeded the Ingraham Street property to Carolyn Robinson. BX F 5 at 71.

17. The same day, Carolyn Robinson executed a Deed of Trust mortgaging the Ingraham Street property for $65,000. *Id.* at 72–79.

18. The interest rate on the mortgage was 12.930%. *Id.* A broker's fee of $6,500 was paid to Bankers Financial from the settlement funds. BX F 6 (HUD Form 1–A).

19. Delco Title was paid a settlement fee of $350. *Id.*

20. Delco Title received a check for $824.20 out of the settlement funds. BX F 7 at 93. In addition to the settlement fee listed above, this payment included items 1102 and 1103 on HUD Form 1–A: $325 for "Abstract or title search to Lots and Squares Abstractors" and $160 "Title examination to Spectrum Title Services." BX F 6 at 84. In fact, Delco paid only $75 to Spectrum Title Services and $155 to Lots and Squares Abstractors. BX F 7 at 108. Accordingly, the fees retained by Delco totaled $590.

21. Respondent's law office, Evans & Evans received $1,700.00 in fees from the settlement funds. This included document preparation fees (items and 1104 and 1105 on HUD Form A–1) and $1,300.00 in fees for probate work (item 1107).

22. In total, Respondent retained $2290 from this transaction.

23. Respondent did not receive approval from the Probate Court before accepting these payments. See BX D at 32; Tr. II at 159, 166.

D. *Mishandling of the Estate and Closing*

24. Maurice Robinson was an heir to Zaidee Robinson's estate. Bar Counsel's experts testified that, because Maurice Robinson was deceased, it was necessary to open and probate his estate before transferring assets from his mother's estate. Tr. I at 69(Fox), 260 (Potkin).

25. Respondent did not open an estate for Maurice Robinson prior to transfer of the Ingraham Street property. Tr. I at 123.

26. It is apparent from the record that the Respondent intended the renunciation

forms Clifton and Yusef Robinson filed with the probate petition to operate as waivers of their interest in the Ingraham Street property. The Committee found it was plain on the face of the document that the signatory only waived the right to act as personal representative of the estate and not the right to estate property. HC Report PFF 7 (citing Tr. I at 183–87 (Respondent)). The Board accepts this finding.

27. The Committee noted that Respondent gave inconsistent explanations regarding how he came to make this ineffective filing. Respondent initially claimed that he was acting on advice he received personally from a probate official, Donald Horton. BX D at 33. *See also* Tr. I at 167 and Tr. II at 212. According to Respondent, "the probate official handed this to me and said, instead of having this one signed, sign this one, and have Mr. Clifton Robinson sign this one to renounce his interest in the property." Tr. I at 167.

28. However, the Committee noted that Respondent had made previous statements under oath that his office clerk, not Respondent, received the advice from the probate division regarding what form to use. BX G 15 at 259; BX G 13 at 187.

29. When confronted at the Hearing with the prior inconsistent testimony, Respondent conceded "I did send Tommy and he went there for me" referring to his assistant Thompkin Hallman. Tr. I at 195 (Respondent). Respondent did not call Mr. Hallman as a witness to this alleged conversation with the probate officer. The probate officer involved, Mr. Horton, now retired from the probate office, was called by Bar Counsel. He had no recollection of a conversation with Tommy Hallman where he suggested they use a "renunciation of personal representation form" to

renounce rights to the estate assets. Tr. II at 142 (Horton).

30. The Committee did not find Respondent's conflicting testimony to be credible. Accordingly, it found that he had not received any advice or suggestion from the probate division that he should use the ineffective form as a release of the signatory's right to estate property. HC Report PFF 8 & 9. The Board accepts this finding.

31. Bar Counsel's expert testified that, in any event, an heir can only renounce a share in an estate within nine months of the date of death. After this time expires, the heir must formally assign his rights to effectively transfer title of estate property. Tr. I at 61–62(Fox).

E. *Subsequent Legal Proceedings*

32. On July 11, 1997, Clifton Robinson filed an affidavit with the Probate Court alleging that his signature had been forged on the Petition for Probate, the Consent and Waiver of Bond, and the Renunciation. BX G 14.

33. In response to this affidavit, the Probate Court entered an Order directing Qawi Robinson and Carolyn Robinson to appear on September 10, 1997 and "show cause why they should not be removed as co-personal representatives" of the estate. BX E 2.

34. At that hearing, the Respondent learned that his client, Carolyn Robinson, had forged Clifton Robinson's signatures. Tr. I at 27(Respondent); BX D at 35. The Committee declined to find that Respondent knew about the forgeries before the hearing and it credited Respondent's testimony that he had no reason to question the signatures obtained by his client. HC Report PFF 13. The Board accepts this finding.

35. Bar Counsel's probate expert opined that she would write to the other heirs to make sure "they had no interest," and "make certain that they signed an assignment or something." Tr. I at 69 (Fox); *see also Id.* at 76 (Fox). The Committee concluded, however, that this testimony did not support a finding that a competent probate attorney would have insisted on this course of conduct, *i.e.*, would have spoken to or corresponded with the other heirs personally, rather than accept the statements of Ms. Robinson and the signatures she had supposedly obtained. HC Report PFF 13.

36. The show cause hearing was continued until November 13, 1997. Respondent did not attend the November 13 hearing. Respondent later claimed his absence from court was "due to a posting error by new personnel in ... [my] office." BX D at 27.

37. In a written Order issued on November 14, 1997, the Court removed Carolyn and Qawi Robinson as Co–Personal Representatives. The Court noted, "with this loan clouding the status of the [Ingraham Street property] Carolyn Robinson has an obvious conflict of interest of her own that precludes her ability to discharge her fiduciary duty." BX F 9 at 146–49.

38. The Court appointed Benny L. Kass, Esq. to act as personal representative of Zaidee Robinson's estate. *Id.*

39. The November 14 Order also directed the removed co-personal representatives to file an affidavit detailing the assets and debts of the estate on or before January 5, 1998. *Id.* Respondent was served with a copy of this Order.

40. The removed co-personal representatives did not file the required affidavit. On the filing deadline, Carolyn Robinson filed a petition for an extension of time, claiming that she needed more time to comply because she was no longer represented by Respondent and that she had expected him to file the affidavit on her behalf. The Court denied this request in a written Order, dated January 28, 1998. *Id.* at 166–72.

41. In the January 28 Order, the Court expressed concern over (1) Respondent's ownership of the title company used for the loan on the estate property, and (2) Respondent's continued representation of the estate and Ms. Robinson, "knowing that she was using as collateral realty that did not belong to her" and suggested that Bar Counsel should investigate this apparent conflict. *Id.* at 170–71.

42. The Court also noted that Respondent had made no effort to explain his absence at the November 13 hearing. *Id.*

43. The January 28 Order was served on both Respondent and Bar Counsel. *Id.*

44. On February 2, 1998, Respondent moved to withdraw as counsel for the estate, which the Court allowed on March 11, 1998. BX E 3 at 58–59; BX E 4 at 60.

45. On May 8, 1998, Mr. Kass filed a civil action against Carolyn Robinson, Qawi Robinson, Respondent and his law firm, and Delco Title over the erroneous probate and property settlement. BX F 9 at 133–45. Respondent settled the claims against him for $37,500. Tr. II at 42 (Kass).

### III. Analysis

We agree with the Committee's findings that Respondent violated Rules 1.1(a), 1.1(b), 1.7(b)(4) and 8.4(d) and find no cause to overturn its finding that he did not violate Rule 3.3(a) or 8.4(c). Our analysis differs somewhat from that of the Committee, which found that Respondent's misconduct was largely the result of in-

competence and negligence. We find the central factor in Respondent's misconduct was his use of a probate proceeding to facilitate the closing of a questionable real estate transaction in which he had a financial interest. The violations arise from this conflict of interest, which lead to the various specific "shortcuts," errors, and more serious failings on which the Committee premised its findings. Because we view Respondent's violations of Rules 1.7(b)(4) and 8.4(d) as central to our analysis, we address them first. We then analyze violations relating to Respondent's failure to provide competent representation as required by Rule 1.1(a) and (b).

## A. Rule 1.7(b)(4)—Conflict of Interest

Rule 1.7 is founded upon the principle that a client is entitled to undivided loyalty and zealous legal representation. Subsection (b)(4) of the Rule, when read in conjunction with subsection (c), prohibits a lawyer from representing a client in a situation where the lawyer's professional judgment may be adversely affected by the lawyer's own financial, business, property, or personal interests in the absence of the informed consent of the client.[3] The Committee found that the record was unclear as to whether "Respondent or a representative of Delco Title or anyone else in Respondent's office" made the required disclosure to Carolyn Robinson. HC Report PFF 15. Because it is Respondent's burden to demonstrate his client's waiver of a conflict, the Committee ultimately

found that "the consent and disclosure requirements of Rule 1.7(b) were not met." HC Report at 26.

Respondent argues that Bar Counsel did not prove lack of consent and notes that under Delco Title "company policy" the attorney who actually handled the closing, in this case Respondent's associate, was responsible for informing the client of Respondent's interest in Delco prior to settlement. Opposition at 13. Bar Counsel argues that Respondent's admitted failure to personally ensure that Carolyn Robinson had given her informed consent to the potentially conflicted representation is sufficient support for the Committee's finding of a violation. BC Brief at 28–29.

We find Bar Counsel's argument persuasive. Our analysis differs from the Committee in that we find that Bar Counsel presented clear and convincing evidence that Respondent did not know whether Ms. Robinson had been informed of and knowingly waived the potential conflict. Finding of Fact ("FOF") ¶ 10. As the Board has previously explained in a matter involving subsections (2) and (3) of Rule 1.7(b) "[w]here a potential conflict of interest exists there is an unqualified obligation to provide 'full disclosure' before accepting the representation of the new client." *In re Boykins,* BDN 375–96 at 20 (BPR June 17, 1999). Although we have found no cases addressing this obligation in a context analogous to the one before us, Comment 25 to Rule 1.7

---

3. Rule 1.7 provides in pertinent part:
 (b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if . . .
 (4) The lawyer's professional judgment on behalf of the client may be adversely affected by . . . the lawyer's own financial, business, property, or personal interests.

(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if each potentially affected client provides consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation.

 

("Business Affiliated with a Lawyer or Law Firm") is instructive. This Comment specifies that both a lawyer recommending the services of an enterprise in which that lawyer has an interest and a lawyer accepting a referral from such an enterprise have an obligation to inform the client of the conflict. In the second situation, "the lawyer should not accept such a referral without full disclosure of the nature and substance of the lawyer's interest in the related enterprise." Cmt. 25 to Rule 1.7.

This case involves the second situation described in Comment 25. The course of events began when Carolyn Robinson went to a mortgage broker in order to borrow money using the Ingraham Street property as collateral. Respondent's relationship with Carolyn Robinson began when her mortgage broker referred her to Delco Title to close the loan. Upon learning that Carolyn Robinson did not have title to the property and that it was still part of her mother-in-law's estate, Respondent, in his capacity as lawyer, undertook representation of Ms. Robinson with the objective of transferring title of the property to Ms. Robinson so that she could obtain a mortgage loan. Accordingly, as the lawyer accepting the referral, Respondent had an independent duty to make certain that the

potential conflict was fully and adequately disclosed to Carolyn Robinson and that she knowingly waived this conflict prior to commencing the representation.[4] He admittedly did not do this. *See* Tr. II 175–76 (Respondent). We find that Respondent violated Rule 1.7(b)(4) by failing to acquire the informed consent of his client regarding the potential conflict arising from his interest in Delco Title. We consider this more than a technical violation of the Rule. As discussed more fully below, Respondent initiated a probate proceeding so that Carolyn Robinson could take title to the Ingraham Street property and then close the mortgage loan. It was in his financial interest for the loan to close, and it did.[5] The other violations at issue in this proceeding all arise from Respondent's conduct in furtherance of that objective.

B. *Rule 8.4(d)—Conduct that Seriously Interferes with the Administration of Justice*

Rule 8.4(d) proscribes conduct that "seriously interferes with the administration of justice." *In re Hopkins*, 677 A.2d 55, 61 (D.C.1996), explains that to establish a violation of Rule 8.4(d) Bar Counsel must show by clear and convincing evidence that:

---

4. The Committee appears to have focused its analysis on the question of whether Respondent's interest in Delco was ever disclosed to Ms. Robinson. HC Report PFF 15. Even if a disclosure had been made at the closing as per the purported "company policy," Resp. Brief at 13–14, this would not rectify Respondent's failure to provide the disclosure prior to representing Ms. Robinson in connection with the estate.

5. Although we are not asked to find whether, on the record before us, Carolyn Robinson's loan was a commercially reasonable transaction, its terms do not appear favorable to Respondent's client. Ms. Robinson paid a

10% broker's fee ($6500) in addition to the other closing costs and the interest rate was nearly 13%. *See* FOF ¶¶ 19–24. The broker's fee was paid to a broker on which Delco Title relied for a steady stream of business. We are also troubled by the items on the HUD form A–1 which reflect higher amounts than Respondent actually paid for third-party services in connection with the closing. *Id.* However, because these payments are not within the scope of the charges before us, we can only note their apparent unfairness and observe that they underscore the significance of Respondent's failure to obtain the informed consent of his client.

1. Respondent's conduct was improper, *i.e.*, that Respondent either acted or failed to act when he should have;

2. Respondent's conduct bore directly upon the judicial process with respect to an identifiable case or tribunal; and

3. Respondent's conduct tainted the judicial process in more than a *de minimis* way, *i.e.*, it must have potentially had an impact upon the process to a serious and adverse degree.

The Committee found that Respondent violated Rule 8.4(d). In its analysis, the Committee noted three specific instances of improper conduct in satisfaction of the first element of *Hopkins:* 1) Respondent's failure to attend the November 13 hearing regarding the forged documents; 2) Respondent's failure either to withdraw from the representation or ensure that his client complied with the Probate Court's November 14 Order directing her to file an accounting; and 3) Respondent's acceptance of payment of legal fees from estate assets without prior court approval. HC Report at 21–22. The Committee noted that it might not have found a violation based on any one of these failings alone, but it found a violation because taken together they "impacted adversely on the Probate Division's ability to effectively administer the estate." *Id.* at 22–23.

Respondent argues that this conduct does not establish a violation. First, he argues that missing a single court hearing, which he claims was the result of a new staff member failing to include it on his calendar, cannot provide the basis of a Rule 8.4(d) violation. Opposition at 10–12. On the second point, he argues that he had no duty to withdraw from the representation of Carolyn Robinson because her son led him to believe that she would be in contact with him. *Id.* at 12. On the third point Respondent argues that it was not necessary to obtain court approval for his fees.[6] *Id.*

Bar Counsel argues that the record supports the Committee's determination. Bar Counsel questions the Respondent's excuse for missing the November 13 hearing and argues that a single unexcused failure to attend a court hearing can be sanctionable misconduct. BC Brief at 23. Bar Counsel argues that remaining silent in the face of the Court's subsequent order requiring his clients to provide an accounting is also a violation. *Id.* On the third point Bar Counsel argues that taking his fee from the estate without court approval was not only improper, but it resulted in the Court being unaware of his handling of estate assets. *Id.* at 24. Finally, Bar Counsel argues that the subsequent civil action by the estate against Respondent is evidence that this misconduct interfered with the administration of justice. *Id.* at 25.

Although we agree that Bar Counsel has proved a violation of Rule 8.4(d), we do not find that the specific instances of misconduct found by the Committee are the only basis for the violation. The record demonstrates that Respondent repeatedly took shortcuts in connection with the Zaidee Robinson probate proceeding and committed numerous other failures in addition to the conduct noted by the Committee. These include:

- Failing to get Carolyn Robinson's waiver of the conflict of interest arising from Respondent's interest in Delco Title (*see* Section II. A. *supra*);
- Failing to open an estate for Maurice Robinson prior to transfer of the

---

**6.** The merits of this position are addressed below in Section II.C.

Ingraham Street property (FOF ¶¶ 24, 25);

- Filing facially defective renunciation forms for Clifton and Yusef Robinson (FOF ¶¶ 26, 31);
- Failing to even attempt to contact Clifton Robinson regarding his interest in the estate (FOF ¶ 35);
- Failing to obtain court approval for the transfer of the Ingraham Street property to Carolyn Robinson, and;
- Ignoring his client's obvious conflict of interest in acting as a fiduciary to the estate (FOF ¶ 37).

Although one or two of these individual failings might be attributable to carelessness, collectively they are emblematic of Respondent's misconduct. The totality of circumstances demonstrate that Respondent manipulated the probate proceeding to transfer real estate to his client under questionable circumstances when Respondent's own business interest was to close a mortgage on the property. The first element of *Hopkins*—improper conduct by the Respondent—is met on this record.

This improper conduct is different from the typical Rule 8.4(d) case involving a failure to appear at a hearing or otherwise cooperate in a judicial proceeding. *See In re Shepherd*, BDNs. 313–98 & 83–89, at 20 (BPR Dec. 10, 2003) (pending appeal) (unexcused failure to appear at hearing); *In re Lyles*, 680 A.2d 408 (D.C.1996) (per curiam) (failing to obey court order); *In re Robinson*, 635 A.2d 352 (D.C.1993) (per curiam) (same); *In re Jones*, 521 A.2d 1119 (D.C.1986) (failing to respond to Bar Counsel's legitimate inquiries). A knowing failure to obey a specific court order is not, however, a required element of a violation.

In *Hopkins*, for example, the improper conduct was a more general failure to take action when, based on facts known to her, respondent should have concluded that she needed to act in order to prevent the serious interference with the administration of justice. The respondent in *Hopkins* was counsel to the personal representative of an estate. The only other heir waived the requirement of a personal representative's bond based on respondent's promise that she would retain joint control over the estate funds with her client by placing them in a joint account. Contrary to respondent's undertaking the funds were not put in a joint account and respondent later learned that her client was making unauthorized withdrawals. Thereafter, the respondent took certain steps to stop her client from depleting estate funds, but she did not seek a court order to freeze the account. By the time her client's misdeeds came to the attention of the Court, the account was fully depleted. The Court found that, under the circumstances, respondent's failure to follow-up on her earlier attempts to protect estate funds constituted improper conduct. *Hopkins*, 677 A.2d at 61—64.

Here, Respondent both took actions that he should have known had the potential to seriously interfere with the administration of justice and failed to act when necessary to prevent such interference. In Respondent's own words, the "probate estate was opened to have the appropriate people appointed to sign for the loan." BX F 5 at 67 (Respondent's letter to Kass dated November 26, 1997). Respondent initiated a probate proceeding in order to close a real estate loan on property his client did not own. Given the potential for self-dealing inherent in these circumstances, even if Respondent genuinely believed that Carolyn Robinson would eventually inherit an interest in the Ingraham Street property, he was obligated to use all of his legal

skills and knowledge to ensure that she had good title before encumbering the property. He did not. Instead, Respondent took shortcuts and made mistakes without fully considering the propriety of such actions or the effect they might have on the probate proceeding. This allowed his client to encumber improperly the only asset of the estate. We find that this constitutes improper conduct.

Although the Committee did not find that Respondent knowingly participated in fraud, conduct can be "prejudicial to the administration of justice whether it was reckless or somewhat less blameworthy." *Hopkins*, 677 A.2d at 60 (internal citations omitted). In *In re Hallmark*, the Court declined to find a violation where the alleged wrongful conduct,—submitting one "obviously deficient" CJA voucher—was the result of negligence. 831 A.2d 366, 367 (D.C.2002). The Court contrasted this failing with cases "where there is intentional disregard for the effect that an action may have on judicial proceedings or the client's cause." *Id.* In accordance with *Hallmark*, the Board recently clarified that Rule 8.4(d) does not extend to mistakes that are "innocent in character." *In re Agee*, BDN 243–01 (May 14, 2004) at 33. In Agee, the respondent failed to properly record or correct a mistake in a court's recitation of a plea agreement. This ultimately resulted in the charges against the defendant being vacated. We declined to find a violation there because the respondent's conduct was a mistake born of momentary inattention. Here, however, Respondent's misconduct did not arise from a passing failure. Respondent's multiple failings reflect an "intentional disregard" for the effect that his actions might have on the probate proceeding. Accordingly, we find that Respondent engaged in im-

proper conduct under the first prong of *Hopkins*.

We further find that Respondent's improper conduct satisfies the final two prongs of *Hopkins*. It bore directly upon the judicial process in connection with an identifiable case by tainting the probate proceeding that Respondent initiated to close the loan. We further conclude that this misconduct had more than a *de minimis* effect on that proceeding. Respondent assisted his client in mortgaging the estate's only asset, the Ingraham Street property. The successor personal representative had to take corrective actions that would not otherwise have been necessary to recapture the value of the estate, including bringing a suit against the Respondent and his former client. Accordingly, we find that Respondent engaged in improper conduct that tainted an identifiable case in more than a de minimis way in violation of Rule 8.4(d).

### C. *Rule 1.1(a) Competent Representation*

Rule 1.1(a) obligates every lawyer to "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." An attorney who has the requisite skill and knowledge to provide competent representation, but nonetheless fails to engage in the thoroughness and preparation reasonably necessary in the course of an active representation, violates Rule 1.1(a). *In re Nwadike*, BDN 371–00 (BPR July 30, 2004).

To prove a violation, Bar Counsel must not only show that the attorney failed to apply his or her skill and knowledge, but that this failure constituted a serious deficiency in the representation. *Id; see also In re Ford*, 797 A.2d 1231, 1231 (D.C.2002) (per curiam) (Rule 1.1(a) violation requires proof of "serious deficiency" in attorney's

competence). The determination of what constitutes a "serious deficiency" is fact specific. It has generally been found in cases where the attorney makes an error that prejudices or could have prejudiced a client and the error was caused by a lack of competence. *See In re Schlemmer,* BDNs 444–99, 66–00 (BPR Dec. 27, 2002), *remanded on other grounds,* 840 A.2d 657 (D.C.2004). Mere careless errors do not rise to the level of incompetence. *See Ford,* 797 A.2d at 1231.

The Committee found that Respondent failed to meet the Requirements of Rule 1.1(a) in three respects: 1) filing ineffective renunciation statements for Yusef and Clifton Robinson; 2) permitting Carolyn Robinson to distribute estate assets without court approval; and 3) taking his fees out of the estate without court approval. We agree with the Committee that filing the ineffective renunciation form in and of itself establishes a violation of Rule 1.1(a). We take a different approach, however, with respect to Respondent's failures to obtain Court approvals. We find that these failings arose from a more general failure by Respondent to apply his skill and knowledge in this matter. We ultimately conclude that this general failure provides the basis for a second, independent violation of Rule 1.1(a).

### 1. The Ineffective Renunciation Form

Respondent argues that he reasonably relied on representations from his legal assistant that Mr. Horton, then Deputy Registrar of Wills, told him the renunciation form he filed on behalf of Yusef and Clifton Robinson was sufficient to transfer their interests in the Ingraham Street property. Resp. Brief at 9. Bar Counsel responds that the Committee properly rejected Respondent's contention that he relied on the advice of probate officials in connection with filing these forms. *Id.* at 12.

First, we note that Respondent's argument is in effect a challenge to the fact finding of the Committee. We defer to the factual findings made by the Hearing Committee if supported by substantial evidence in the record, viewed as a whole. Board R. 13.7; *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson,* 583 A.2d 1006, 1008 (D.C.1990) (per curiam). We find the Committee's determination that Respondent was not relying on the advice of a probate official when he filed the ineffective forms to be supported by substantial record evidence.

In reaching this determination, the Committee examined Respondent's various explanations regarding how he came to file the ineffective renunciations. In this proceeding, Respondent testified that he personally selected the form at the direction of Mr. Horton. See Tr. I at 188. In an earlier proceeding, Respondent gave testimony and filed interrogatories stating his law clerk spoke with Mr. Horton. BX G 3 and BX G 15. When confronted with these prior inconsistent statements, Respondent conceded that he personally did not have the conversation. Tr. I at 195. Mr. Horton testified that he did not recall the purported conversation with Respondent's law clerk (Tr. II at 142) and Respondent did not call his law clerk to rebut this testimony. The inconsistencies in Respondent's testimony on this point, when coupled with Mr. Horton's contrary testimony, provide sufficient support for the Committee's finding. Accordingly, we do not find that Respondent's filing of the ineffective renunciations can be attributed to improper advice from the probate department.

Second, even if Respondent had relied on the advice of Mr. Horton, this would not excuse his failure to file appropriate renunciation statements. As noted in the comments to Rule 1.1, "competent handling of a particular matter includes ... use of methods and procedures meeting the standards of competent practitioners." On its face the form that Respondent filed only purports to renounce the signatory's right to act as personal representative and waive the requirement of a bond to protect his or her share in the estate. We agree with the Committee that Respondent, as the attorney for Ms. Robinson, was responsible for reading the forms he instructed her to file. HC Report at 16. A competent practitioner would not rely on the advice of non-attorneys to the point of not even reading documents filed on a client's behalf. We further agree with the Committee that, if he had read beyond the title, Respondent would have known that the form was insufficient. Although Respondent had the knowledge and skill to make this determination, he failed to apply it here.

This failing had the potential to prejudice his client. Had Clifton Robinson actually intended to renounce his share of the estate and its sole asset, the Ingraham Street property, the form filed by Respondent would not have accomplished that objective. If, as Respondent believed, his client was the intended beneficiary of the renunciation, then the filing of an ineffective form was directly prejudicial to her interests. The fact that there was no actual prejudice to Ms. Robinson, because Clifton did not intend to renounce his share of the estate, does not remove the potential for prejudice. Accordingly, we find that Respondent's filing of a plainly deficient legal form on his client's behalf violated Rule 1.1(a).

## 2. General Failure to Provide Competent Representation

We need not find that the instances in which Respondent failed to obtain court approval are in and of themselves separate violations of the Rule. As described by the Committee, and by the parties in their briefs to the Board, the question of whether these failings violate Rule 1.1(a) depends on whether amendments to the probate code, adopted in 1994 and effective in 1995, applied to the estate. Under the earlier version of the statute, it was necessary to obtain court approval for payments to a personal representative or lawyer for the estate and before any transfer of estate property. The revision obviated the need for such approval in most circumstances.

Zaidee Robinson died well before the statutory revision. Respondent argues, however, that the statutory scheme in place when the estate was opened applies to this matter. Opposition at 3–8. Therefore, according to Respondent, it was not necessary to obtain court approval for either his fee or the transfer of the Ingraham Street property. *Id.* He further argues that because this is a reasonable position about an unsettled point of law, his good faith belief that he was acting in accordance with the law protects him from a violation. *Id.* at 8. Bar Counsel argues that the law as it stood at the time of Zaidee Robinson's death, which required court approval, applies and that Respondent's arguments to the contrary "evidence his incompetence." BC Brief at 14.

Although we agree with Bar Counsel that the earlier version of the statute applied to the estate, Respondent's failure to make this distinction may have been no more than a careless error.[7] Moreover,

7. While there is case law clearly stating that
the 1994 Amendment to the Probate Code

we think that this debate over probate law obscures the gravamen of Respondent's incompetence. Competent handling of a legal matter *"includes inquiring into and analysis of the factual and legal elements of the problem,* and use of methods and procedures meeting the standards of competent practitioners." Cmt. 5 to Rule 1.1(b) *(emphasis added).* Bar Counsel argued to the Committee that "it was incumbent on the Respondent to advise Mrs. Robinson that her apparent desire to obtain legal title to her deceased mother-in-law's property was beset with complications." BC Proposed Findings of Fact and Conclusions of Law at 24. This is true, but it also misses what we find to be the essence of Respondent's incompetence. Respondent failed to make a basic assessment of the factual and legal issues implicated by the proposed transfer of legal title to Carolyn Robinson. As a result, he was unable to properly advise his client.

While actual prejudice to the client need not be shown, potential prejudice is sufficient, here Ms. Robinson was prejudiced by Respondent's failure to provide competent representation. She was removed as personal representative of the estate and had a legal action filed against her. Although her own dishonesty in connection with the purported forged signature contributed to these consequences, her self-interested transfer and encumbrance of the Ingraham Street property was the primary cause of her removal and the suit

against her. *See* BX F 9 (Complaint in *Kass v. Robinson* and Probate Court Orders attached thereto). Competent probate counsel would have recognized the impropriety of this transaction. Accordingly, we find that Respondent's general failure to provide competent representation to Ms. Robinson was a serious deficiency and violated Rule 1.1(a).

### D. *Rule 1.1(b)—Skill and Care*

Rule 1.1(b) requires a lawyer to "serve a client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." The Committee found that essentially the same conduct that violated Rule 1.1(a) also violated subsection (b). HC Report at 18. In addition, the Committee found that Respondent's failure to open a probate estate for Maurice Robinson, was another instance in which Respondent failed to apply the requisite level of skill and care. *Id.* at 19.

We agree with the Committee that the same failings that constitute Respondent's 1.1(a) violations constitute 1.1(b) violations. Respondent did not differentiate between his defense of the 1.1(a) charge and the 1.1(b) charge. Opposition at 8. Accordingly, we address here only the additional basis for the Committee's finding a 1.1(b) violation—the failure to open a probate estate for Maurice Robinson. Respondent argues that it was not a legal necessity to open an

applies only to estates of decedents dying after 1995, *In re Estate of King,* 769 A.2d 771, 777 n. 7 (D.C.2001) and *In re Estate of Delaney,* 819 A.2d 968, 993 (D.C.2003), these decisions post date the instant representation. Ms. Fox, Bar Counsel's expert on probate law, was not asked whether competent counsel would have recognized this distinction in 1997. The D.C.Code § 20–109 provides that Title 20 applies to "an estate of a decedent who died on or after January 1, 1981." In

the current version of the Code, the "miscellaneous notes" to certain sections of Title 20 refer to the 1995 application date, including § 20–701.01, which is the general provision allowing unsupervised probate. The notes to the specific sections of Title 20 that formerly required court approval for the transactions at issue here, §§ 743 and 751, do not contain this note, although they do refer back to § 701.01.

estate for Maurice, and if he was mistaken in this regard, it was due to excusable inadvertence that does not violate Rule 1.1(b). Opposition at 10. Bar Counsel argues that Respondent is again wrong regarding the applicable law and that the record establishes that he did not meet the requirements of Rule 1.1(b). BC Brief at 18.

Once again, the specific misconduct noted by the Committee is symptomatic of Respondent's greater failing. We find that Respondent failed to act with the skill and care that lawyers would generally use in probating an estate without detaining the specific question of whether he ignored the legal requirement to open an estate for Maurice Robinson.[8] Bar Counsel presented expert evidence regarding the standard of care (*see* Tr. I 59–60, 73–74(Fox) 259–61(Potkin)) and there is substantial evidence in the record that Respondent failed to meet it. Accordingly, we sustain the Committee's finding that Respondent violated Rule 1.1(b).

E. *Rules 3.3(a)(2) and 8.4(c)—Candor and Honesty*

Rules 3.3(a)(2) and 8.4(c) both relate to a lawyer's fundamental duty of honesty. Rule 8.4(c) contains a general prohibition against conduct involving dishonesty, fraud, deceit, or misrepresentation.[9] Rule 3.3 codifies a lawyer's specific duty of candor to a tribunal.[10] The Committee found

that Bar Counsel did not establish that Respondent knew or should have known that his client forged Clifton's signature on various probate documents. HC Report at 24. Bar Counsel did not take exception to this finding.

We agree with the Committee that it was necessary to show either knowing or reckless dishonesty for a violation of either rule to arise from Respondent's submission of the forged probate documents. *In re Schneider,* 553 A.2d 206, 209 (D.C.1989); *In re Shorter,* 570 A.2d 760, 767–68 & n. 12 (D.C.1990). Submitting a document that another person has falsely signed is not obviously wrongful or dishonest. Accordingly, Bar Counsel has the burden of showing intent. *In re Romansky,* 825 A.2d 311, 315 (D.C. 2003). The Committee credited Respondent's testimony that he had no reason to doubt the word of his client. Accordingly, the Committee found that Respondent's conduct was neither reckless nor intentional. We will not disturb this finding, which is based on a determination that is within the sphere customarily left to the fact finder. *See In re Arneja,* 790 A.2d 552, 555 (D.C.2002) (citing *Micheel,* 610 A.2d at 234).

IV. *Sanction Recommendation*

The Committee recommended that Respondent be suspended from the practice of law for sixty days and required to attend continuing legal edu-

---

8. Although it appears that Maurice's interest in his mother's estate should not have been distributed to his heirs without a probate proceeding, *see Douglas v. Lyles,* 841 A.2d 1, 3 (D.C.2004), Bar Counsel's expert advised because the Registrar of Wills accepted the petition to open the estate without reference to an estate for a deceased heir, "I foresee problems with the competency argument in this area." BX G 17.

9. Rule 8.4 reads in pertinent part:
 It is professional misconduct for a lawyer to: * * * (c) [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation.

10. Rule 3.3 reads in pertinent part:
 A lawyer shall not knowingly: * * * (a)(2) [c]ounsel or assist a client to engage in conduct that the lawyer knows to be fraudulent or criminal.

cation courses on ethics and probate law. Without supporting argument, Respondent has asked us to reject the recommended sanction. Although Bar Counsel disagrees with the Committee's evaluation of the impact of Respondent's misconduct, the recommended sanction is not challenged.

The appropriate sanction is what is necessary to protect the public and the courts, to maintain the integrity of the profession and "to deter other attorneys from engaging in similar misconduct." *In re Uchendu*, 812 A.2d 933, 941 (D.C.2002)(internal citations omitted). Recognizing that each case must be evaluated on its facts, the sanction imposed must be consistent with cases involving comparable misconduct. D.C. Bar R. XI, § 9(g)(1); *In re Dunietz*, 687 A.2d 206, 211 (D.C.1996). On the facts before us, we conclude that a longer suspension than recommended by the Committee, with a portion stayed in favor of probation supervised by a practice monitor, is consistent with other cases involving similar misconduct and is necessary to protect the public, the courts, and the integrity of the profession and deter future misconduct on the part of others.

### A. *Length of Suspension*

In determining the appropriate sanction, the Board considers the seriousness of the misconduct, sanctions for similar misconduct, prior discipline, prejudice to the client, violation of other disciplinary rules, whether the conduct involved dishonesty, the respondent's attitude, and circumstances in aggravation and/or mitigation. *In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987).

### 1. *Seriousness of Misconduct and Sanctions for Similar Misconduct*

The Committee found that Respondent "engaged in serious misconduct that lead directly to an erroneous transfer of property and erroneous deed being filed with the Recorder of Deeds." HC Report at 27. The Committee compared this conduct to other cases involving incompetence, conflict of interest, and interference with the administration of justice. The sanctions in the cases it considered ranged from public censure to a ninety-day suspension. *See e.g. In re Bland*, 714 A.2d 787 (D.C.1998) (public censure for violations of Rules 1.1(a) and (b) and 1.3(a)); *In re Boykins*, 748 A.2d 413 (D.C.2000) (30–day suspension for violations of Rules 1.1(a) and (b), 1.3(a) and (c), 1.7(b) and 8.4(d) conditionally stayed in favor of probation); *In re Jones–Terrell*, 712 A.2d 496 (D.C.1998) (60–day suspension for violations of 1.7(b) and 1.8(a), and 8.4(c) and (d)); *In re Drew*, 693 A.2d 1127 (D.C.1997) (60–day suspension for multiple violations including Rules 1.1(a) and (b) and 8.4(d)); *In re Shay*, 756 A.2d 465 (D.C. 2000) (90–day suspension for multiple violations including dishonesty and conflict of interest).

The Committee noted that Respondent's misconduct was more serious than the conduct at issue in *Bland*, because of the multiplicity of violations at issue, and in *Boykins* because Respondent, unlike Boykins, was dealing with a familiar area of law. HC Report at 28–29. The Committee found that Respondent's misconduct was less serious than the conduct at issue in *Jones–Terrell* and *Shay* where the essence of the misconduct was dishonesty or serious conflict of interest. *Id.* The Committee found that the Respondent's violations for conflict of interest and interference with the administration of justice were largely the result of incompetence and negligence. *Id.* at 30.

We disagree with the Committee's analysis. As discussed above, we find that Respondent's conflict of interest was at the core of his misconduct. Sanctions in matters involving conflict of interest often involve lengthy suspensions, particularly where the conflict served the respondent's self-interest. *See In re McLain*, 671 A.2d 951 (D.C. 1996)(90–day suspension for conflict of interest where respondent borrowed money from client); *In re Zelloe*, 686 A.2d 1034 (D.C.1996)(90–day suspension for failure to disclose personal interest and dishonesty in connection with a loan transaction); *In re Hager*, 812 A.2d 904 (D.C.2002)(one-year suspension for conflict of interest and dishonesty in connection with failure to disclose settlement-fee arrangement to clients); *In re James*, 452 A.2d 163 (D.C.1982), *cert denied*, 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983)(two-year suspension where attorney entered into real estate transaction with client and was found to have acted dishonestly in unrelated transaction). Respondent's conflict of interest violation was serious and arose from self-interest. Although his misconduct is distinguishable from the majority of the cases cited above because it was not accompanied by dishonesty, it was accompanied by a violation of Rule 8.4(d), which is a serious aggravating factor.

### 2. *Prior Discipline*

Respondent has been subject to discipline on two other occasions. First, he received an informal admonition for failing to supervise the work of an associate attorney in 1982. In 1990, Respondent was suspended for six months for negligent misappropriation for taking a fee from an estate without proper authorization. *In re Evans*, 578 A.2d 1141 (D.C. 1990). The conduct at issue in the second proceeding is very similar to that at issue here. In that instance, Respondent claimed to have relied on false assurances from one heir that another heir would consent to his taking an extra-fee from an estate.[11] *Id.* at 1146—47. As he did here, Respondent failed to make required filings and failed to attend a court hearing addressing these deficiencies. *Id.* In both cases, Respondent's misconduct had the practical effect of obscuring the finances of an estate from the heirs and the Court. The Board's statement in the prior case is apt here: "Respondent was more than 'lax and casual' in his handling of this estate; he appeared insensitive to his fiduciary responsibilities and he violated those responsibilities." *Id.* at 1151. This case suggests that either Respondent learned nothing from his last brush with the Board or that he has lapsed back into unacceptable conduct. We find that Respondent's prior discipline is highly relevant to the issue of sanction.

### 3. *Prejudice to the Client*

The Committee concluded that because his client "was the apparent

11. The record does not indicate why Bar Counsel did not charge misappropriation in this matter. Any unauthorized use of client funds is misappropriation. *See In re Anderson*, 778 A.2d 330, 335 (D.C.2001) (citation omitted). Respondent could not take fees from Zaidee Robinson's estate in the absence of court approval. Failure to obtain the required approval before taking such a fee constitutes misappropriation. *See In re Fair*, 780 A.2d 1106, 1110 (D.C.2001). The fact that current probate law does not require court approval does not affect the ultimate question of whether the use of funds was "unauthorized," although it may have some bearing on whether a resulting misappropriation was intentional, reckless, or negligent. *Id*, at 1112–13.

perpetrator of the forged probate documents and the beneficiary of both the resulting probate and erroneous real estate transaction, Respondent's actions cannot be said to have caused her prejudice." HC Report at 27. Bar Counsel questions this conclusion, noting that Respondent's failure to properly transfer Yusef and Clifton Robinson's interests in the estate and failure to properly open an estate for Maurice Robinson prejudiced his client. BC Brief at 31. According to Bar Counsel, these failings lead directly to Carolyn Robinson's removal as personal representative and the subsequent civil law suit against her. Although we understand the Committee's reluctance to ascribe prejudice to a client whose own misconduct directly contributed to the adverse results against her, we agree with Bar Counsel that this does not diminish the role Respondent played in the outcome. Had Respondent contacted Clifton Robinson, which he should have done, he would have uncovered Carolyn Robinson's attempted misrepresentation and surely put a stop to it. But Respondent never even tried to make that initial contact. So rather than advising his client not to engage in self-dealing as the personal representative of the estate, Respondent ended up helping her to do so. She was prejudiced by this failure to receive competent legal counsel. Accordingly, we find that Respondent's misconduct ultimately did prejudice his client.

### 4. *Attitude of the Respondent*

The Committee found that "Respondent remains in denial of any wrongful conduct on his part." HC Report at 28. Bar Counsel argues that Respondent's refusal to take responsibility in this matter is a factor weighing in favor of suspension. BC Brief at 33. Lack of re-

morse does not always weigh in favor of an enhanced sanction. *See In re Kennedy,* 542 A.2d 1225, 1231 (D.C.1988) (lack of remorse given no emphasis because attorney is entitled to protest a recommended sanction). Under the facts before us, however, where Respondent continues to advance what we consider to be patently erroneous arguments, Respondent's failure to acknowledge any wrongful conduct—or even errors in judgment—is troubling. *See Hager,* 812 A.2d at 915 (finding that respondent's continued argument that he did not violate any ethical rules was "untenable in one with due sensitivity to the bounds of legal ethics"). Accordingly, we have considered this fact in constructing our sanction as discussed below.

### 5. *Circumstances in Aggravation and/or Mitigation*

No additional aggravating or mitigating circumstances were presented by the parties.

The Board must consider the "total picture" of Respondent's professional conduct. *In re Washington,* 541 A.2d 1276, 1283 (D.C.1988). This matter involves the failure to provide adequate legal services to a single client. Although there was no finding that Respondent acted dishonestly, his neglect of his ethical duties was born of a conflict of interest, coupled with incompetence and serious interference with the administration of justice, that were harmful to both his client and the Court. What is worse, Respondent was subject to previous discipline for similar failings. Under the circumstances, we find that a more substantial sanction than the sixty-day suspension recommended by the Committee is warranted.

A six-month suspension is within the range of sanctions provided for similar conflict of interest cases. In a recent case arising from a lawyer's failure to obtain his

client's consent to a waivable conflict of interest, the Court adopted the Board's recommendation of a thirty-day suspension. *In re Butterfield,* 851 A.2d 513, 514 (D.C.2004). Although Respondent similarly failed to obtain a wavier from his client, his misconduct goes far beyond that at issue in *Butterfield,* where no other disciplinary violations were found. A sixty-day suspension was imposed in *Jones–Terrell* for multiple violations including conflict of interest and interference with the administration of justice. 712 A.2d at 500. Although respondent was also found to have acted dishonestly in that action, the Court found a more serious sanction was not warranted because she was inexperienced and did not have any prior rule violations. *Id.* Here, although not found to be dishonest, Respondent is an experienced attorney with two prior instances of discipline who has, *inter alia,* seriously interfered with the administration of justice. This weighs in favor of a more stringent sanction.

Respondents in *Shay* and *McLain* both received ninety-day suspensions for cases involving conflict of interest. The misconduct at issue in *Shay,* like *Jones–Terrell,* involved dishonesty coupled with conflict of interest. 756 A.2d at 475–480. In that action, the Board noted several mitigating factors that are not present here, including that the respondent had no prior discipline and her actions were not motivated by self-interest. *Id.* at 480–81. In *McLain,* where respondent accepted a loan from and engaged in a real estate transaction with a client, the Board also found several mitigating factors, including the respondent's remorse and his pro bono work on behalf of needy clients. 671 A.2d at 954. These mitigating factors are absent here. And in neither *Shay* nor *McLain* was there a history of prior serious misconduct.

In *Hager,* the respondent put his own interests ahead of his ethical duties to his client in the course of negotiating a settlement. 812 A.2d at 921. In that action, respondent was suspended for one year for conduct that involved dishonesty in addition to self-serving conflict of interest. *Id.* at 917. The Court found that this conduct "demonstrated at best an ethical numbness to the integrity of the attorney-client relationship, the very core of the active practice of law." *Id.* at 921. Although not found to be dishonest, the instant Respondent's misconduct displays a similar failure to protect the integrity of the relationship at the core of our profession. We find Respondent's misconduct to be less serious than that at issue in *Hager,* but only slightly so. Moreover, the *Hager* Court noted mitigating factors, such as lack of prior discipline and the respondent's record of pro bono legal service, which are absent here. *Id.* at 921–22.

Respondent's prior discipline makes this matter more serious than any of the cases discussed above. His misconduct is also more serious than that at issue in *McLain* in that it also interfered in the administration of justice and arose from his active legal practice. It is more serious than *Shay* because the conflict of interest was self-serving. However, the fact that Respondent was not found to be dishonest distinguishes this matter from *Hager.* Accordingly, we find that a suspension of more than ninety days, but less than one year is consistent with cases involving comparable misconduct.

This matter differs from the cases discussed above in one other important respect. *Shay; McLain* and *Hager* involved unique situations that were not susceptible to repetition. *See McLain,* 671 A.2d at 954; *Shay,* 756 A.2d at 485. Here, there is a strong potential that Respondent, who has demonstrated a serious inattention to

the details of his practice, could find himself in a similar situation in the future. Respondent has been sanctioned and suspended for misconduct of a similar character, albeit resulting in different violations, in the past. *See generally Evans*, 578 A.2d 1141. That Respondent is once again before the Board for similar conduct evidences that he has failed to take or maintain the necessary steps to ensure that his conduct meets the required ethical standards.

Our responsibility to the public does not permit us to assume that the Respondent will take these steps of his own accord. He continues to operate both a title company and law practice in the absence of sufficient procedures to protect against potential conflicts. He is willing to assign important tasks, such as responsibility for conflict waivers, court filings and court schedules, to employees, but does not appear to have adequate checks in place to ensure they are performed correctly. Finally, Respondent continues to insist that these procedures are proper and sufficient.

Under these circumstances, we find that the goals of protecting the public and the courts and maintaining the integrity of our profession will be best served by appointing a practice monitor to work with the Respondent to reform this practice and his conduct. Accordingly, we recommend that the Court impose a six-month suspension, with ninety days stayed contingent on Respondent's acceptance and successful completion of a one-year probationary period under the supervision of a practice monitor. We have relied on practice monitors in similar cases to help lawyer's subject to discipline comply with their ethical obligations. *See In re Baron*, 808 A.2d 497 (D.C.2002) (per curiam); (D.C.1999); *In re Stow*, 633 A.2d 782, 785–86 (D.C.1993) (per curiam).

Although *Baron* and *Stow* imposed practice monitoring as a condition of probation in lieu of suspension, monitoring may be required in addition to a suspension. *See In re Edwards*, 870 A.2d 90, 98 (D.C.2005) (citing D.C. Bar R. XI, § 3(a)(7)); *see also In re Ontell*, 724 A.2d 1204 (D.C.1999) (90–day suspension (with 90 days stayed) and one year probation supervised by a practice monitor). In *Edwards*, the Board recommended a suspension of six months for negligent misappropriation with reinstatement conditioned on completion of a continuing legal education class on handling client funds. 870 A.2d at 93. The Court was unconvinced that remedial instruction was sufficient given that respondent had "every opportunity and incentive to master her ethical responsibilities" but failed to do so. *Id.* at 98. Therefore, the Court required a practice monitor in addition to a suspension.

We are mindful of the Court's directive that "monitoring services are a scarce as well as valuable resource that should not be called upon indiscriminately." *Id.* We find this matter, where Respondent has been subject to discipline on two occasions for conduct involving careless handling of probate matters, but has not demonstrated dishonesty or an overall lack of fitness, is an appropriate one in which to use of this scarce resource.[12]

12. The Committee declined to impose a fitness requirement, as requested by Bar Counsel below. HC Report at 31. Citing our decision in *In re Cater*, BDN 337–99 *et al.* (BPR June 26, 2003), the Committee found that the record did not contain clear and convincing evidence that cast serious doubt on Respondent's continuing fitness to practice law. *Id.* We agree with this finding, although we recognize that our recommendation in *Cater* is still pending before the Court.

Accordingly, we recommend that the final ninety days of Respondent's six-month suspension be stayed contingent upon Respondent's agreement to be placed on probation for a period of one year. To ensure that he has sufficient preparation for reinstatement, before his probation begins, Respondent must submit to the Board and Bar Counsel proof that he has completed not less than six hours of continuing legal education courses concerning the proper handling of probate matters and legal ethics during his suspension. During his probation, Respondent will be supervised by a practice monitor to assist him in establishing better office procedures and controls to ensure that each client and matter he handles gets the necessary attention and preparation, and that all conflicts are disclosed, including any that arise out of the interface between Respondent's title company and his law practice. Respondent must meet with the practice monitor as the monitor deems necessary, but not less frequently than four times a year, to review Respondent's active practice of law.[13] The practice monitor will submit quarterly progress reports to the Board, with a copy to Bar Counsel. If at any point during that year of probation Respondent fails to cooperate with the practice monitor, he will be subject to revocation of probation and the imposition of the stayed ninety days of his suspension.

### V. *Conclusion*

The Board sustains the Committee's finding that Respondent violated Rules 1.1(a), 1.1(b), 1.7(b)(4) and 8.4(d). We recommend the following sanction for these violations: (1) that Respondent be suspended for six months; (2) that during his suspension, Respondent be required to complete six hours of continuing education classes in probate law and legal ethics; (3) that the final ninety days of his suspension be stayed on the condition that Respondent agree to be placed on probation for a period of one year; (4) that during the probationary period Respondent be subject to oversight by a practice monitor; and (5) that failure to cooperate with the practice monitor shall constitute a violation of his probation resulting in the imposition of the stayed portion of his suspension.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /s/ Martin R. Baach
Chair

Dated: May 31, 2005

---

**13.** All communications between Respondent and the practice monitor are subject to disclosure under Rule 1.6(I).